## JOHN G. ALBRIGHT ET AL., APPELLEES, v. TEXAS, SANTA FE & NORTHERN RAILROAD COMPANY, APPELLANT.

1. CORPORATIONS—UNPAID SUBSCRIPTIONS TO CAPITAL STOCK.—The unpaid subscriptions to the capital stock of a corporation are, in equity, a trust fund for the benefit of creditors.

2. CREDITORS' BILL—JUDGMENT—EXECUTION—RETURN OF NULLA BONA. Held: That where it is sought to reach, by equitable process, the equitable interests of a debtor, the bill must set forth a judgment in the jurisdiction where the suit is brought, the issuing of an execution thereon, and its return unsatisfied, or must allege facts showing it was impossible to obtain such a judgment in any court within such jurisdiction, unless otherwise provided by statute. Tube Works Co. v. Ballou, 146 U. S. 523.

3. HEARING—DECREE PRO CONFESSO AS TO DEFENDANT PERSONALLY SERVED, BUT NOT ANSWERING—PROOF.—Held: That where complainant brings his case to a hearing and fails to take a decree pro confesso against a defendant personally served, but not answering, before taking a decree against such defendant, complainant must prove his case.

4. AMENDED BILL, FAILURE TO SERVE NOTICE OF.—Where leave was
granted to file an amended bill on condition that defendants be served
with notice thereof before the cause come to a hearing,—Held: That a
decree pro confesso taken on the same day without serving defendants
with process could not stand against them.

ON REHEARING. Reversed (with directions). LAUGH-
LIN, J., concurring, and BANTZ and HAMILTON, JJ., in
result.

The additional facts are stated in the opinion of
the court.

E. A. FISKE and CHARLES A. SPIESS for appellant.

W. B. CHILDERS for appellees.

COLLIER, J.—It is stated in the original bill and
repeated in the amended bill, that on the judgment re-
covered by Albright there was issued on November 24,
1885, an execution, and that afterward on January 13,
1886, the sheriff made a return of nulla bona, and that
there was a similar return on the execution issued on
the Marshall judgment. The sheriff's return on the
Albright execution of January 13, 1886, shows "that
after diligent search I am unable to find any property
of the defendant in my county subject to execution,
and I further certify on the fourth day of December,
1885, in my county, I served a written notice as gar-
nishee, together with a copy of execution upon one
Lehman Spiegelberg," etc., etc. There was no return
of nulla bona shown on the Marshall execution.

The record also shows that a venditioni exponas
upon the Albright execution, issued out of the district
court on June 6, 1887, for the sale of certain property
levied on as the property of the defendant company on
January 27, 1887, being two locomotives, a number of
cars, timber, ties and other things, that on June 22,
1887, the sheriff advertised said property for sale on
July 11, 1887, but received notice from the president
of defendant company that the property did not belong

to it, but to the Southern Trust Company; he postponed sale notifying plaintiff's counsel, that he demanded an indemnifying bond, and it not being furnished the sheriff made public proclamation, that the sale of the said property would not take place. It is not shown that anything further was done with said execution, nor that anything was done with the garnishment served under the first execution.

Upon the rehearing which was granted, the whole case was again elaborately argued, the solicitor for appellant urging strenuously and with great zeal, that the decision already rendered in this cause holding that unpaid subscriptions for stock are in equity a fund, for the benefit of creditors, though conceded by him in his brief on the first hearing, is not the law since the decision of Hollins v. Brierfield Coal & Iron Co., 150 U. S. 381. We think the construction counsel seeks to put upon this decision, viz.: That it is a modification if not an absolute reversal of prior decisions of the United States supreme court is not tenable; and his brief in the paragraph quoted by us in our former decision is still, we believe, a correct exposition of the law on this subject. Referring, however, to the additional statement of facts above set forth, it appears, that as to the Marshall judgment there has not been even an execution issued, and of course no return of nulla bona. Unless the garnishment served upon the execution prevents, it may be said that there was a return in January, 1886, of nulla bona upon the execution on the Albright judgment. But it also appears that a year later another execution issued upon the Albright judgment, and that there was property levied on apparently largely exceeding in value the amount of the judgment, and that no sale was made of the same, because it was claimed by the president of defendant company, to be property not belonging to it. The sheriff declined to proceed

*CORPORATIONS: unpaid subscriptions.*

with the sale thereof, because of refusal on plaintiff's part to give an indemnifying bond.

It is urged by counsel for appellees, that whether the statement of the president of defendant company, that the property levied on was not its property was true or false, so far as this case is concerned it was a statement binding said company, and that said return, containing said statement, was equivalent to a return of nulla bona. If it had appeared in the sheriff's return, that after diligent search he had been unable to find any other property of defendant, this conclusion or presumption might possibly arise, but no such statement appears, and strictly it would have to be held, that allegations of the bill and amended bill as to there being returns of nulla bona upon executions of said judgments or either of them, are not proven. While counsel for appellees contended in his oral argument, that return of nulla bona was merely one of the means of showing insolvency, so that the right of the creditor of a corporation to sue for unpaid subscriptions on stock would accrue, yet in his brief on the rehearing he contends as to the time the statute of limitations began to run, and supports his contention with much authority, that the creditor must have obtained judgment against the corporation, with a return of nulla bona, before he can sue the stockholders.

*Creditors' bill: judgment: execution: return of nulla bona.*

Thus in Taylor v. Bowker, 111 U. S. 110, the court holds that under the Maine statute the creditor could not file his bill until execution was returned nulla bona. The rule as to this is plainly stated in National Tube Works Co. v. Ballou, 146 U. S. 523, in which it is said that: "Where it is sought by equitable process to reach equitable interests of a debtor, the bill UNLESS OTHERWISE PROVIDED BY STATUTE, must set forth a judgment in the jurisdiction where the suit is brought, the issuing of an execution thereon and its return un-

satisfied, or must make allegations showing that it was impossible to obtain such a judgment in any court within such jurisdiction." The point of there being no return of nulla bona was not directly involved in National Tube Works Co. v. Ballou, supra, as the suit was upon a foreign judgment, and was dismissed upon demurrer, because there was no averment of any judgment or effort to obtain one, or that it was impossible to obtain one, but in the discussion of the case the above doctrine was laid down, and for its support Taylor v. Bowker, supra, and numerous other decisions were cited.

In Terry v. Anderson, 95 U. S. 628, one of the cases cited in National Tube Works Co. v. Ballou, supra, it is said by the court that "ordinarily a creditor must put his demand in judgment against his debtor and exhaust his remedies at law before he can proceed in equity to subject choses in action to its payment, and to this rule, however, there are some exceptions."

In the case of Jones v. Green, 1 Wall. 330, there was a bill by judgment creditors to subject property held in secret trust, it being alleged that the debtor was insolvent. There was a decree in favor of complainants, and it was held, that the objection that it was not shown that complainants had attempted to enforce their remedy at law was fatal to the relief prayed. The bill alleges that executions were issued upon the judgments of complainants, and were returned unsatisfied, but no proof on this subject was produced at the hearing. This is precisely the situation as to the Marshall judgment, as no execution whatever is shown to have issued, and the only question as to the Albright judgment is whether there is a sufficient return showing nulla bona.

Jones v. Green, supra, went up from the territory of Nebraska, and it seems in harmony with National Tube Works Co. v. Ballou, supra, in the principle an-

nounced by the latter that UNLESS OTHERWISE provided
by statute there must be judgment, and return of the
same unsatisfied.  We have examined with care the
authorities, which counsel for appellees cite in support
of the contention, that the return of nulla bona is not
essential to the giving of these plaintiffs a standing in
a court of equity, and notice them as follows:

The case of Terry v. Tubman, 92 U. S. 160, shows
that a demurrer was filed to the plea of the statute of
limitations framed upon the statute in force in the state
of Georgia, the demurrer proceeding upon the idea,
that the plea was bad inasmuch as it merely alleged the
notorious insolvency of the corporation, as a starting
point of the statute, and the demurrer was overruled
distinctly upon the ground that such an allegation was
at least the equivalent of what was alleged in the bill
about insolvency of the same corporation, and that the
demurrer cut back to the first error in pleading.

The inference in this decision is rather against than
in favor of appellees' contention.

The case of Camden v. Doremus, 3 How. 533, was
a suit upon a guaranty, and the court's holding was
based solely upon a construction of the words "use of
reasonable and due diligence" found in the contract of
guaranty, and is in no sense an authority on this
question.

The case of Reynolds v. Douglass, 12 Pet. 497, is
more nearly in point, as there it is held that in an ac-
tion at law against a guarantor, the insolvency of the
principal debtor need not be proved by record evidence,
but it should not be construed as militating against
what in the cases herein cited, is stated to be the rule
governing creditors, who pursue equitable interests of
a debtor after judgment obtained.

The only cases counsel refers us to as seeming
directly in point, are Tabb v. Williams, 4 Jones Eq.
(N. C.) 352, and Hough v. Cress, Id., and there it is

stated that relief ought to be had whenever by an execution and return of nulla bona OR OTHERWISE it appears, etc., but in the first place these cases seem to conflict with the supreme court of the United States, and in the second place, the bill in this case claims relief simply upon the ground of a return of nulla bona, and not upon any other ground as showing insolvency.

For these reasons which are more elaborately considered, than in our former opinion, we think the conclusion we arrived at was erroneous, and that the judgment of the lower court should be reversed.

As to the extent this reversal goes is a matter we will proceed to discuss. Certainly it should be reversed as to the appellants Lehman Spiegelberg and Bernard Seligman, and it remains to be considered what should be done as to the defendants and appellants Gildersleeve, Martinez and Ortiz y Salazar.

The record shows "leave to amend bill filed to correspond with proofs taken, and that defendants are required to answer said amended bill within twenty days from the time of service of copy of same, and that said cause be set down for hearing as soon as same is at issue on the amended pleadings."

The amended bill was filed on June 30, 1892, and notice thereof and order allowing it to be filed and be answered in twenty days after service of copy thereof was served on "C. H. Gildersleeve for himself and E. A. Fiske solicitor for defendants in the said cause" on June 14, 1892. There is nothing showing that Martinez or Ortiz y Salazar was given notice either personally or through their solicitor, unless notice to Gildersleeve, which on its face was restricted to him personally, can be considered notice to them.

Neither Martinez, Ortiz y Salazar nor Gildersleeve answered the amended bill though the final decree recites that Gildersleeve did. As to Martinez and Ortiz y Salazar the final decree recites a failure to answer

and that the amended bill "be taken as confessed" as to them and defendant company. Neither is there anything in the record that notice of the filing of the amended bill was given to defendant company. The amended bill differs from the original bill in that it sets forth more at length the alleged transactions of the charter subscribers in subscribing for stock, and failing to pay cash required for organization, but putting up checks never intended to be presented for payment instead.

It appears, therefore, that in the order giving leave to file the amended bill two things were required: (1) That it was to correspond with the proofs already taken; and (2) that defendants were to be served with notice of the amended bill before the cause could come to a hearing.

*Hearing: decree pro confesso as to defendant personally served but not answering: proof.*

If what we have already said in this opinion as to complainants' failure to show a return of nulla bona be true, it would seem that the amended bill, inasmuch as it merely repeats the allegations of the original bill on this subject, does not conform to the proofs taken, and if Martinez and Ortiz y Salazar had no notice of the filling thereof, they ought not to be bound by complainants' act with respect to the amended bill.

That leave in effect authorized the complainants to set forth in apt language by their amended bill the necessary averments which were justified by the proofs already submitted. A reply to this may be, however, that so far as Martinez and Ortiz y Salazar are concerned they had established by the decree pro confesso upon the original bill the fact that there had been a return of nulla bona, though the same can not be said as to Gildersleeve. As to Gildersleeve we think the matter may be disposed of by saying, that he either answered or he did not answer. If he answered as the final decree recites, there is the same infirmity in proof as to him,

as against Spiegelberg and Seligman. If he did not answer there should have been a decree pro confesso, and none was taken.

It is held in Pegg v. Davis, 2 Blackf. (Ind.) 281, that if any particular claim be not answered a decree may be taken pro tanto as confessed, and that if complainant instead of so doing bring the case to a hearing, he can only be entitled to relief in this regard by proving it. This decision presupposes the necessity of taking a decree pro confesso upon the whole bill, or proving the case.

It has been held in Shields v. Bryan, 3 Bibb. (Ky.) 525, that a decree can not be taken against a defendant not answering unless default has been taken, and in Carmen v. Watson, 1 How. (Miss.) that where one of the codefendants did not answer a decree against him without taking the bill pro confesso was irregular and should be set aside.

As to the defendants Martinez and Ortiz y Salazar, we find it stated that after an order to take the bill pro confesso has been obtained, it can not be amended even to the extent of correcting a clerical error without vitiating the proceedings. 1 Danl. Ch. Pr., sec. 522.

AMENDED bill: failure to serve notice of.

And in Harris v. Dietrich, 29 Mich. 366, that if a bill is materially amended when the defendant fails to appear, the decree pro confesso taken on the same day and without serving process, is irregular and sufficient grounds for opening it, and granting a rehearing.

As enforcing the idea that in the absence of a decree pro confesso the complainant must prove his case, it is stated to be at the election of complainant to take a decree pro confesso, when the cause shall be proceeded in ex parte, etc. Rule 14 of Equity Rules.

Unless it is within the province of this court to enter a final decree against the defendants Martinez and Ortiz y Salazar upon the original bill, it is diffi-

cult to see how any such decree may be entered against them at all. We think it should be held that appellees stand before the district court, and now stand before this court, asking relief not upon the original but only upon the amended bill, and it not appearing that Martinez or Ortiz y Salazar have ever had any day in court as to the amended bill the decree against them thereon can not stand.

Wherefore it is considered and ordered that the judgment heretofore rendered by this court, affirming the decree of the district court be, and the same is upon this rehearing, set aside, and the cause is reversed with directions to the district court to vacate in conformity with this opinion the decree entered in the district court, with costs in behalf of appellants to be taxed.

LAUGHLIN, J., concurs.

BANTZ, J.—Without dissenting from the views expressed by Justice COLLIER, I prefer to base the judgment of reversal upon the distinct ground that the indebtedness for which a decree was rendered against appellees was barred by the statue of limitation.

HAMILTON, J. (concurring).—I concur in the conclusion reached by the court in this case, and think the judgment should be reversed; but I can not agree with the views expressed in the opinion upon the question of what is known as the "trust-fund doctrine;" nor can I agree with the court as to the effect to be given to the decision of the supreme court of the United States in the case of Hollins v. Iron Co., 150 U. S. 371. I understand the doctrine as announced and approved by that decision to be that there is no direct and express trust or lien attached to the property and assets of a corporation in favor of its creditors so long as the corporation remains a solvent and going

concern; that, when a corporation is created and placed in operation under its charter, it is a distinct entity—a distinct personality—in the eyes of the law; and, while it remains solvent, it has the same right to control and direct its affairs within the limits prescribed by the terms of its charter that an individual would have over his property. It has the right to acquire, lease, mortgage, sell, and dispose of its property within the limits of its charter, and so long as it acts without fraud or collusion, to the detriment of its stockholders or creditors. If its directors or officers attempt, by fraudulent means, to convey or misapply its funds or property, then a court of equity will interfere to protect the rights of the creditors and stockholders. But, while it remains solvent, it controls and directs its affairs independent of its creditors and stockholders, and there is no express trust or lien in favor of either against its funds or property. Becoming insolvent and in the hands of the court, it loses control over all its assets, and the same at once become a trust fund in the custody of the court, who, in the absence of a trustee, administers upon and distributes them for the benefit of those who, under the law, may be entitled to them. Solvent and going, there is no lien or trust relation between the creditor and the company, but only the ordinary relations of debtor and creditor. Insolvent and in the custody of the court, the relations of trustee and cestui que trust at once arise, and the chancellor administers the trust, and disposes of the property, and distributes the proceeds —first, to the creditors, and, secondly, to the stockholders.

It is earnestly contended by counsel for the complainants that this position is in open hostility to the fixed and settled doctrine of the supreme court of the United States, announced in all of its previous decisions. It is insisted that the capital stock of an

incorporated company is a fund set apart for the pay-
ment of its debts; that the corporation is merely a
trustee, holding its property for the benefit of its
creditors and stockholders.

It may not be out of place to look into some of the
previous decisions of that court upon this question,
and see if such a doctrine as contended for has really
ever been the settled rule of that court, and, if so, to
what extent has such rule been modified by the rule in
the Hollins case, above cited.   Perhaps the most posi-
tive and expressive language of that court upon this
subject is to be found in the opinion of Justice SWAYNE
in the case of Sanger v. Upton, decided in October,
1875, and reported in 91 U. S. 56, as follows: "The
capital stock of an incorporated company is a fund set
apart for the payment of its debts.   It is a substitute
for the personal liability which subsists in private co-
partnerships.   When debts are incurred, a contract
arises with the creditors that it shall not be withdrawn
or applied otherwise than upon their demands, until
such demands are satisfied.   The creditors have a lien
upon it in equity."   In order to understand fully the
scope and meaning which should be given to the lan-
guage of the court used in the above quotation, we
must be advised as to the nature of the case which the
court then had under consideration, that we may
understand the principles of law therein declared as
applied to the facts of the case which were then before
the court.   The Great Western Insurance Company,
with an authorized capital of $500,000, had become
insolvent, as a result of the great Chicago fire, of 1871.
It was forced into bankruptcy, and all of its effects had
passed into the custody of the bankrupt court, and
were being administered by its assignee.   Its assets
consisted largely of the unpaid subscriptions to its
capital stock.   The bankrupt court, under the author-
ity given it, and to provide means for the payment of

creditors, made an order which had the effect of a call upon the delinquent subscribers for their unpaid subscriptions, and the assignee, Upton, was ordered to collect the same. The appellant, Sanger, declined to pay, and suit was brought by the assignee to recover upon the stock. The company having become insolvent, and its property and effects having passed into the custody of the bankrupt court, to be administered by its assignee, the court held that the unpaid subscription to the capital stock was a trust for the benefit of the creditors. The court was there dealing with the property of an insolvent and dissolved corporation, then in its custody, and held that all of its property and effects, including its unpaid subscriptions to its stock, were a trust fund set apart for the payment of the debts of the company. Broad as is the above language used by the court, it must be construed as applying to a class of cases such as the one then under consideration. The court was then dealing with a bankrupt corporation, and announced a doctrine and applied a rule governing the property of a corporation in its insolvent state. I can not believe that the court intended to announce a broad and unvarying rule which should apply as well to the property and assets of a solvent and going corporation as it did to the property of an insolvent company in the hands of the court. Solvent and going, the property and assets of a corporation are managed and controlled absolutely by the directors and officers of the company, subject only to the rules of law applicable to debtor and creditor, and the right of the latter to collect its demands. If the company becomes insolvent, and is taken charge of by the court, the conditions in relation to its property at once change. The company loses control, and a trust is created on behalf of both creditor and stockholder against such property and assets; and the right then to have the same collected, converted into money,

and applied by the court to the payment, first, of the creditors, and next to the stockholders, clearly exists. If an attempt should be made by the directors or officers of the insolvent corporation to fraudulently misapply its funds, or to engage in enterprises not warranted by its charter, the stockholders may interfere and call them to account for such action, and prevent such attempted abuse of their powers. This right of the stockholders of a solvent corporation to interfere in such cases is based, not upon the idea that they have a lien upon the property of the company, or an express trust in their favor, but upon the ground that the agent may always be compelled to account for the misapplication of the funds of his principal, and for the abuse of the power of his agency. I do not think that the supreme court, by the language used in the case of Sanger v. Upton, supra, or in other similar cases, intended to lay down the universal rule that the property and assets of a solvent and going corporation are a trust fund in the hands of the company, for the benefit of its stockholders and creditors, but intended only to make such rule applicable to corporations which were insolvent and in process of liquidation. That this is the correct view as to what has been decided by that court is confirmed by the language used by it in subsequent decisions.

In the case of Webster v. Upton, assignee, decided by the same court, at the same term, and in a case arising out of the same bankrupt company, brought by the assignee to collect its unpaid stock subscriptions, Justice STRONG, on page 71, in speaking of the liability of the subscribers for the unpaid subscriptions, observes: "This results from the fact that the whole subscribed capital is a trust fund for the payment of creditors when the company becomes insolvent." 91 U. S. 71. This clearly shows that the court, in the use of the language in the Sanger case, "that

the capital stock of a corporation is a fund set apart for the payment of the debts to that extent," intended only to apply the same to insolvent corporations in process of liquidation by the court, and not to solvent corporations generally.

In the case of Terry v. Anderson, 95 U. S. 628, the Planters' Bank of the state of Georgia had become insolvent and failed, and an assignment was made for the benefit of its creditors. A bill was filed against the stockholders to reach the unpaid subscriptions to the stock of the bank. Chief Justice WAITE, in delivering the opinion of the court, says: "Ordinarily, a creditor must put his demand into judgment against his debtor, and exhaust his remedies at law, before he can proceed in equity to subject choses in action to its payment. To this rule, however, there are some exceptions: and we are not prepared to say that a creditor of a dissolved corporation may not, under certain circumstances, claim to be exempted from its operation. If he can, however, it is upon the ground that the assets of the corporation constitute a trust fund, which will be administered by a court of equity in the absence of a trustee; the principle being that equity will not permit a trust to fail for want of a trustee." The court in that case was dealing with an insolvent corporation, and settling a controversy between the creditors of the company and the liability of a delinquent subscriber, and declares simply that the assets of an insolvent corporation are a trust fund which will be administered by a court of equity, and would not allow the trust to fail for want of a trustee.

In the case of Graham v. Railroad Co., 102 U. S. 148, a bill was filed by the complainant, Graham, against the La Crosse & Milwaukee Railroad Company, and the Milwaukee & St. Paul Railway Company, and Moses Kneeland and others to set aside certain conveyances made by the officers and agents of

the company of certain real estate belonging to the company, and to subject the same to the payment of the claims of the complainant, who became a judgment creditor of the company subsequent to the conveyance. The conveyances were alleged to have been fraudulently made by and to the agents and officers of the company, and for less than their full value. The conveyances were made at the time when the company was a solvent and going concern. The supreme court affirmed the decision below, denying the right of recovery. Justice BRADLEY, in delivering the opinion of the court, in discussing the trust-fund doctrine, and the right of solvent and insolvent corporations to manage and dispose of their property and assets, on page 160, 102 U. S., observes: "It is contended, however, by the appellant, that a corporation debtor does not stand on the same footing as an individual debtor; that, whilst the latter has supreme dominion over his own property, a corporation is a mere trustee, holding its property for the benefit of its stockholders and creditors; and that if it fail to pursue its rights against third persons, whether arising out of fraud or otherwise, it is a breach of trust, and creditors may come into equity to compel an enforcement of the corporate duty. This, as we understand, is the substance of the position taken. We do not concur in this view. It is at war with the notions which we derive from the English law with regard to the nature of corporate bodies. A corporation is a distinct entity. Its affairs are necessarily managed by officers and agents, it is true; but, in law, it is as distinct a being as an individual is, and is entitled to hold property (if not contrary to its charter) as absolutely as an individual can hold it. Its estate is the same. Its interest is the same. Its possession is the same. Its stockholders may call the officers to account, and may prevent any malversation of funds, or fraudulent disposal of property on their

part. But that is done in the exercise of their corporate rights, not adverse to the corporate interests, but coincident with them. When a corporation becomes insolvent, it is so far civilly dead that its property may be administered as a trust fund for the benefit of its stockholders and creditors. A court of equity, at the instance of the proper parties, will then make those funds trust funds, which, in other circumstances, are as much the absolute property of the corporation as any man's property is his.'' If the language used by that court in any of its previous decisions were such as to leave a doubt as to its position upon the trust-fund doctrine, and as to the power of a corporation over its funds or property, or as to the legal relations existing between a corporation and its stockholders, such doubt is clearly removed by the expressive language used by Justice BRADLEY in this decision. It is, in effect, that a corporation, in its solvent condition, subject only to the terms of its charter, has absolute dominion over its property and assets, freed from any lien or trust in favor of either the creditor or stockholder. Becoming insolvent, the corporation is civilly dead; and a court of equity, at the instance of the proper parties, will take charge of its property and effects, and will administer them as a trust fund, for the benefit of those who may be entitled to it. The insolvency of the company, and the possession of its affairs by the court, convert at once all of the property into a trust fund, which till then is not a trust fund, or subject to any lien on behalf of the creditor.

In the case of Railway Co. v. Ham, 114 U. S. 587, there had been a consolidation of four railroad companies, under an agreement whereby the new company was to protect the rights of the old companies. The new company, subsequent to the consolidation, executed a new mortgage on all the property, to pay a large bonded indebtedness. In a controversy between

the bondholders of the new company and a mortgagee of one of the old companies, it was contended that the property of the original company, the Toledo & Wabash Railway Company, was a trust-fund for the payment of all its creditors; and, when the new company took the property of this company under the consolidation, it took it charged with that trust. Justice GRAY, in delivering the opinion of the court (114 U. S. 594) says: "The property of a corporation is, doubtless, a trust fund for the payment of its debts, in the sense that when the corporation is lawfully dissolved, and all its business wound up, or when it is insolvent, all its creditors are entitled, in equity, to have their debts paid out of the corporate property before any distribution thereof among the stockholders."

The case of Hawkins v. Glenn, 131 U. S. 319, was a bill in equity filed by Glenn, as trustee of the National Express & Transportation Company, an insolvent corporation, to recover the unpaid subscription due from delinquent shareholders. Chief Justice FULLER, in rendering the opinion of the court (131 U. S. 332, 9 Sup. Ct. 743), observes: "Unpaid subscriptions are assets, but have frequently been treated by courts of equity as if impressed with a trust sub modo, upon the view that, the corporation being insolvent, the existence of creditors subjects these liabilities to the rules applicable to funds to be accounted for as held in trust."

In the case of Fogg v. Blair, 133 U. S. 534, the St. Louis & Keokuk Railroad Company was chartered by the legislature of the state of Missouri in 1867. It located its road, and the appellant, Fogg, did something over $9,000 worth of work for the company, the amount of which was settled upon between him and the company in September, 1870. In June, 1872, another company, known as the St. Paul, Hannibal & Keokuk Railroad Company, was also chartered; and,

under an arrangement made between the two companies, the first company sold to the latter all its property and effects, the latter agreeing to assume and pay all liabilities incurred by the first company. Subsequent to this, the new company executed a mortgage to the defendant, Blair, as trustee, to secure a large amount of bonds issued by the new company upon the road. Upon default being made upon the bonds, Blair brought a suit to foreclose the mortgage, to which Fogg was made a party. The latter answered, and filed a cross bill, claiming a lien prior to the bonds, and contended that the new company, under the contract of purchase, took all of the property of the old company, charged with a trust in favor of himself and other creditors of the old company. This contention was denied, and the cross bill dismissed. Justice Field, rendering the opinion of the court (133 U. S. 541), says: "We do not question the general doctrine invoked by the appellant, that the property of a railroad company is a trust fund for the payment of its debts, but do not perceive any place for its application here. That doctrine only means that the property must first be appropriated to the payment of the debts of the company before any portion of it can be distributed to the stockholders. It does not mean that the property is so affected by the indebtedness of the company that it can not be sold, transferred, or mortgaged to bona fide purchasers for a valuable consideration, except subject to the liability of being appropriated to pay that indebtedness. Such a doctrine has no existence."

A careful examination of the above cases will show that they do not support the contention that there is any direct trust or lien upon the property and assets of a corporation in favor of its creditors. I do not think that that court, in any of the above cases, intended to declare such a rule to be the doctrine of

that court; but, if there should have existed any doubt upon this subject from any language used by the court in any of the above cases referred to, then such doubt is clearly removed, and the position of that court distinctly defined, by the clear language used by it in the case of Hollins v. Iron Co., 150 U. S. 371. The defendant company was created a corporation under the laws of Alabama. In 1882 it made and executed to Preston B. Plumb a mortgage to secure $500,000 in bonds. In August, 1887, he, as trustee, took possession of all of the property, and filed a bill to foreclose the mortgage. Some three months after the commencement of this suit, the complainant, who was simply a contract creditor, with no lien upon the property, filed a bill on behalf of himself and other unsecured creditors against the company, the trustee, and unpaid subscribers to the stock of the company, charging that the bonds and mortgages were invalid, setting up the unpaid subscriptions to the stock, asking for a receiver, that the stock be collected, and that the property be sold for their benefit. A decree of foreclosure was entered in the Plumb suit, and the bill of the complainant dismissed. It was contended by the complainant that the property and assets, including the unpaid subscriptions to the capital stock of the company, were a trust fund for the benefit of himself and other general creditors, which could be enforced in their behalf. The court, by Justice BREWER, after reviewing the decision of that court upon the doctrine of trust funds, observes (150 U. S. 381): "While it is true language has been frequently used to the effect that the assets of a corporation are a trust fund held by a corporation for the benefit of creditors, this has not been to convey the idea that there is a direct and express trust attached to the property. As said in 2 Pom. Eq. Jur., section 1046, they 'are not, in any true and complete sense, trusts, and can

only be called so by way of analogy or metaphor.' ''
And the court, in further discussing this subject, on
page 383, says: ''In other words,—and that is the idea
which underlies all these expressions in reference to
'trust' in connection with the property of a corpora-
tion,—the corporation is an entity, distinct from its
stockholders as from its creditors. Solvent, it holds
its property as any individual holds his, free from the
touch of a creditor who has acquired no lien; free,
also, from the touch of a stockholder who, though
equitably interested in, has no legal right to, the prop-
erty. Becoming insolvent, the equitable interest of
the stockholders in the property, together with their
conditional liability to the creditors, places the prop-
erty in a condition of trust, first for the creditors, and
then for the stockholders. Whatever of trust there is
arises from the peculiar and diverse equitable rights of
the stockholders as against the corporation in its prop-
erty, and their conditional liability to its creditors. It
is rather a trust in the administration of the assets
after possession by a court of equity than a trust attach-
ing to the property, as such, for the direct benefit of
either creditor or stockholder.'' Further continuing
this discussion, the court says, on page 385: ''The
officers of a corporation act in a fiduciary capacity in
respect to its property in their hands, and may be
called to an account for fraud, or sometimes even
mere mismanagement, in respect thereto; but, as
between itself and its creditors, the corporation is sim-
ply a debtor, and does not hold its property in trust,
or subject to a lien in their favor, in any other sense
than does an individual debtor.''

The relation existing between a corporation and its
creditors is somewhat analogous to that which exists
between a partnership and its creditors. If a partner-
ship becomes insolvent, a court of equity assumes
charge of all of its property and effects, and, through its

officers, collects and distributes the fund, first, to partnership creditors, before any portion of it can be applied either to the partner or to his individual creditor. It may be said that the court holds the property in trust for the partnership creditors, or that they have an equitable lien thereon. This means that the partnership creditors simply have an equitable prior right to have their claims satisfied out of the partnership property in the hands of the court belonging to the insolvent partnership before individual creditors can be paid. So it is with a corporation. Solvent and out of the hands of the court, it holds complete dominion over its property, unfettered by any direct trust or specific lien in favor of either creditor or stockholder. It can deal and be dealt with in relation to its property as effectually as an individual can with his. While the directors and officers stand in a fiduciary relation in respect to its property, and may be called to account by the stockholders for any fraud or mismanagement of its affairs, yet, as between the corporation and its creditors, there exists simply the relationship of debtor and creditor, and the company does not hold its property charged with any direct trust or lien in their favor. It may be contended that his view is in antagonism to the prevailing and settled opinions of both state courts and text writers upon this subject. Whatever may have been the views of text writers, ratified and supported as they may have been by courts of high state authority, it is sufficient for us that the supreme court of the United States, in the case last cited, has given, in clear and unambiguous language, its latest emphatic expression upon this question, and its opinion is a controlling authority upon this court.

It is said that to adopt this view is to overturn a settled rule applicable to trust funds which, from the days of Judge Story, has grown and become deeply imbedded in our state and national jurisprudence. To

say that this will overturn a settled rule is but to confound the destruction of a principle with the time and manner of its application.    There is a wide distinction between overturning a principle and the time, method, and circumstances of its application.    The principles underlying the trust fund doctrine, as applied to the property and assets of a corporation, are not overturned, but still exist; not, however, in the broad and unlimited degree which some courts of high authority have announced, but in a more limited sense; not in the broad sense that the entire property and assets of a solvent and going corporation are a trust fund, charged with an express trust or a specific lien in favor of either stockholder or creditor, but in the sense that when the conditions and circumstances in relation to the business of a corporation arise, when it becomes insolvent and in the custody of the court, then the principles of the trust fund will apply, and will lay hold of the property, and, under the supervision of the court, will be administered to the creditors and stockholders.    We may observe that this view is consonant with both logic and reason.    The trust fund idea had its origin in the early history of our jurisprudence, when the business of the country was confined to narrow limits, when there were comparatively but few organized companies engaged in the transaction of business, and when there were but few, if any, railroad corporations in existence.    From a provincial state, we have become a great commercial nation, whose vast business interests are largely owned and conducted by artificial persons, in the form of corporate bodies.    Probably four fifths of the capital invested in the commerce and business of the country is controlled and managed in this manner.    To declare that this entire property is held by those corporate bodies charged with an express trust in favor of the individual stockholders, or covered by a specific lien in favor of the creditor, is to extend the application of the

trust fund idea to a dangerous limit, and to a limit never comtemplated by the founders of that doctrine. This is not the abrogation of the rule, nor the destruction of the doctrine, but simply to limit its application to that class of cases where the facts and circumstances will justify the courts in invoking its aid for the relief of creditors and stockholders.

The individual defendants in the case under consideration could not, or did not, pay their ten per cent on their subscriptions to the stock of the railroad company. The officers and directors of the company conceived that it would be to the interest of the company to take back this stock from these original subscribers, sell and negotiate it to other persons, and thus utilize it in the construction of the road. This the officers and directors of the company did, at a time when the corporation was solvent, and managed by a board of directors and officers composed of other persons than the defendants. The corporation, by this transaction, did not lose the benefit of this stock subscription, but controlled and disposed of the same, so that the company received the full benefit of it in the final construction of the road. The company being a solvent and going concern at the time of this transaction, there was no lien or trust in favor of the complainants as against this stock or the unpaid subscriptions of the company; and the directors, pursuing a course which they deemed for the best interest of the company, chose to take back the stock, and sell and dispose of it to other parties, for the use and benefit of the company; and, there being no actual fraud alleged or shown in the transaction, the complainants have no legal right to complain.

I therefore concur in the conclusion reached by the court, upon the grounds herein stated, and also upon the grounds stated by Associate Justice BANTZ as to the statute of limitation.